UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

v.                                                                  15-CR-172
                                                                    ORDER

ERICK PIZARRO,

             Defendant.
_____

      Erick Pizarro was charged in a four-count indictment with: (1) possessing 100 grams or more of a mixture and substance containing heroin with intent to distribute that substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); (2) maintaining a drug-involved premises at 59 Schuele Street, Buffalo, New York, in violation of 21 U.S.C. § 856(a)(1); (3) possessing a firearm—namely, a Stallard Arms Model J-9mm pistol bearing serial number 063584—in furtherance of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (4) possessing that same firearm after having previously been convicted of a crime punishable by imprisonment of more than one year, in violation of 18 U.S.C. §§ 924(g)(1) and 924(a)(2). Docket Item 11. On October 5, 2016, Pizarro moved to suppress physical evidence as well as his statements to law enforcement officers. Docket Item 52. He supplemented that motion on November 29, 2016. Docket Item 55. The government filed its responses to Pizarro's two submissions on October 7, 2016, and December 9, 2016, respectively. Docket Items 53 and 56. Magistrate Judge Hugh B. Scott then held evidentiary

hearings on July 7, 2017, and July 13, 2017. Docket Items 74-77.[1] After both sides filed post-hearing briefs, Docket Items 87 and 88, Judge Scott issued a Report & Recommendation on December 22, 2017, recommending that Pizarro's motions to suppress be denied, Docket Item 89.

This Court granted Pizarro's motion to extend his time to file objections, Docket Items 90 and 91, and on January 19, 2018, Pizarro objected to Judge Scott's Report and Recommendation, Docket Item 93. The government then sought, and this Court granted, a motion to extend the government's time to respond to Pizarro's objections. Docket Items 95 and 96. The government filed its response on February 9, 2018, Docket Item 97, and Pizarro filed his reply on February 16, 2018, Docket Item 99. This Court heard oral argument on February 22, 2018. *See* Docket Item 100. For the following reasons, this Court adopts Judge Scott's Report and Recommendation and denies Pizarro's motions to suppress.

## **FACTS**

On June 9, 2015, Lieutenant Aaron Brennan of the Lackawanna Police Department and Detective Leo McGrath of the Buffalo Police Department participated in the execution of a search warrant at 59 Schuele Street, Buffalo, New York. The warrant authorized searches for and seizures of heroin, drug paraphernalia, proceeds from illicit drug trafficking, evidence of property ownership, and "evidence that tends to demonstrate that an offense or crime was committed." Docket Item 88-3. The defendant, his girlfriend, and her son were present when the warrant was executed. Docket Item 93-1 at 6. McGrath testified that he was the lead officer to enter the

---

[1] All citations to the hearing transcript will be to Docket Items 93-1 (July 7, 2017) and 93-2 (July 13, 2017), the transcripts filed by Pizarro with his objections.

residence and that once other officers secured the premises, he returned to his vehicle to secure his shotgun. Docket Item 93-2 at 68-69. He said that less than a minute later, he returned to the residence and joined Brennan who was with Pizarro. *Id*. at 69.

Brennan testified that as soon as he encountered Pizarro in the master bedroom and moved him to an adjacent room, he asked Pizarro in English whether Pizarro could read and write English, and Pizarro answered, "Yes." *Id*. at 7. Brennan said that he then read the defendant his *Miranda* warnings in English from an advice of rights card. *Id*. Captain Joseph Leo of the Lackawanna Police Department testified that he heard Brennan give Pizarro his *Miranda* warnings. *Id.* at 25-26. More specifically, Leo said that although he was not in the same room as Brennan the whole time, he overheard Brennan advise Pizarro of his *Miranda* warnings in English. *Id*.

Brennan testified that he showed Pizarro a copy of the search warrant for 59 Schuele Street and explained to Pizarro that they were searching for heroin. *Id*. at 9. Before Brennan asked Pizarro whether they would find any heroin, however, another officer announced that he had found heroin in the master bedroom. *Id*. Brennan then told Pizarro that he suspected there might be a handgun in the residence as well, and Pizarro responded that a handgun was hidden in the paneling behind the wall. *Id.* at 9-10. Indeed, Brennan testified that Pizarro directed them to the specific piece of paneling behind which the handgun was hidden. *Id*. at 11. McGrath testified that after both the heroin and the handgun were recovered, he re-entered the house, gave Pizarro his *Miranda* warnings, and began to talk to Pizarro. *Id.* at 69-70.

Brennan also testified that after heroin and the handgun were found, he and other officers discussed arresting all the occupants of 59 Schuele—i.e., Pizarro, his

3

girlfriend, and her son. *Id.* at 11-12. Brennan said that when Pizarro heard that his girlfriend and her son might be arrested, he voluntarily stated "Don't take everyone. Everything's mine." *Id.* at 12. Brennan testified that Pizarro took responsibility for the heroin found on the dresser in the bedroom and for the handgun. *Id.* at 12-13.

Detective Deborah Mulhern of the Buffalo Police Department testified that later the same day, she debriefed Pizarro at Buffalo Police Headquarters. Docket Item *Id.* at 40. Mulhern said that when Pizarro was brought to her office, she immediately advised Pizarro of his *Miranda* warnings from an advice of rights card. *Id.* at 41. She said that after she gave Pizarro his *Miranda* warnings, she asked Pizarro the following two questions from the back of the card: "Do you understand each of these rights I've explained to you? And having these rights in mind, do you wish to talk to me?" *Id.* at 42. Mulhern testified that Pizarro answered each of the questions, "Yes," and that Pizarro wrote his answers on the form, signed it, and dated it. *Id.*

Mulhern also testified that she did not have an interpreter present because Pizarro spoke English; in fact, she said that he never suggested that he did not understand English. *Id.* at 44. In addition to pedigree questions, Mulhern asked Pizarro to tell her what was found in the house and where it was found. *Id.* at 49. Mulhern said that Pizarro told her "that the heroin was in the top drawer in his bedroom. That there was 18 to 20 grams of heroin and 9-millimeter bullets too. He said that there was a gun hiding in the bedroom behind the wall panel. And it was a 9-millimeter handgun black." *Id.*

## ANALYSIS

If a defendant objects to a magistrate judge's Report and Recommendation with respect to suppression of evidence in a criminal case, the court reviews that Report and Recommendation *de novo*. *See* 28 USC § 636(b)(1); Fed. R. Crim. P. 59(b)(3). In conducting its review, the court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

### Suppression of the handgun

Pizarro's first challenge is based on the fact that the search warrant did not specifically authorize the officers to search for a handgun. *See* Docket Item 93. In fact, the search warrant for 59 Schuele Street did not specifically authorize the officers to search for a handgun. But the warrant authorized the officers to search for narcotics and evidence that tends to demonstrate that a narcotics crime was committed. *See* Docket Item 88-3. Because "guns are frequently tools of the drug trade," Judge Scott correctly concluded that the seized firearm was within the scope of that warrant. *See United States v. Hernandez*, 85 F. App'x 269, 271 (2d Cir. 2004); Docket Item 89 at 13. Indeed, the Second Circuit has taken judicial notice that guns are, "to substantial dealers in narcotics, . . . as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia." *United States v. Flaharty*, 295 F.3d 182, 200 (2d Cir. 2002) (citations omitted). Accordingly, Judge Scott correctly concluded that the officers acted within the scope of their authority when they searched for and found the handgun. *See* Docket Item 89 at 13.

Moreover, even if the warrant did not authorize a search for the gun, there still would be no reason to suppress the gun. While legitimately on the premises under a

warrant authorizing them to search for drugs, the officers certainly were entitled to ask the defendant about weapons.  *See id.*; *see generally United States v. Salameh*, 54 F. Supp. 2d 236, 277 (S.D.N.Y. 1999), *aff'd*, 16 F. App'x 73 (2d Cir. 2001) ("officials executing a warrant have some discretion" in interpreting its scope and their interpretation should be "'commonsensical,'" not "'hyper-technical.'" (quoting *Johnson v. Massey*, 1993 WL 372263, at *3 (D. Conn. Sept. 17, 1993)).  And his response—directing officers to a gun hidden behind wall paneling—was voluntarily given.  *United States v. Patane*, 542 U.S. 630, 643 (2004) (plurality opinion) ("Introduction of the nontestimonial fruit of a voluntary statement, such as respondent's [gun], does not implicate the Self–Incrimination Clause.  The admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial.").[2]  Indeed, in *Patane*, the Supreme Court reversed the Tenth Circuit's suppression of a weapon even though the officers in that case (1) did not have a warrant and (2) had not given the defendant his *Miranda* warnings before they asked the defendant whether he had a gun.  542 U.S. at 644.

**Suppression of the statements**

Pizarro also challenges Judge Scott's determination of the credibility of the law enforcement witnesses as to whether Pizarro was read his *Miranda* warnings before he directed the law enforcement officers to the location of the handgun and took responsibility for the drugs found on the premises.  But there is no reason to disturb the credibility determination made by Judge Scott and to suppress Pizarro's statements.

---

[2] *See also United States v. Leon*, 468 U.S. 897, 920-21 (1984) ("when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope . . .[i]n most such cases, there is no police illegality and thus nothing to deter.").

6

The uncontroverted testimony at the evidentiary hearing was that Pizarro was read his *Miranda* warnings by three different law enforcement officers at three different times on June 9, 2015. Most important, Brennan testified that he read Pizarro his *Miranda* warnings as soon as he encountered Pizarro in the bedroom and **before** Pizarro said anything about the heroin in the master bedroom or the handgun hidden behind a panel in the wall. Leo corroborated Brennan's recollection, testifying that he overheard Brennan reading Pizarro his *Miranda* rights while Leo was busy searching another room in the house.[3]

In his objections, Pizarro argues that Leo's testimony was not credible. Specifically, Pizarro asks this Court to second guess Judge Scott's credibility determination because Leo testified that he **heard** Brennan administer *Miranda* warning to Pizarro but did not **listen to** those warnings. Pizarro suggests that such testimony was evasive and therefore incredible. This Court disagrees. There is nothing evasive or suspicious about testimony that while searching in a nearby room, an officer heard, but did not actually listen to, another officer give *Miranda* warnings. What is more, because Judge Scott presided over the evidentiary hearing, he had the best opportunity to hear the testimony, to observe the demeanor of the witnesses, and to make a finding of credibility. There is no reason to revisit his determination.

Pizarro also argues that because McGrath testified that it took him less than a minute to secure his shot gun and return to the house, Brennan's testimony that he read Pizarro his rights and found the gun during that short time period is inherently incredible.

---

[3] As noted above, McGrath also testified that when he re-entered the house after securing his shot gun, he read Pizarro his *Miranda* warnings. And Mulhern testified that she too read Pizarro his *Miranda* warnings before she took a written statement at police headquarters.

7

Again, this Court disagrees. First, the testimony about timing was not exact. Moreover, there is no reason to credit McGrath's rough estimate of time more than Brennan's and Leo's testimony about what occurred in the interim. Stated another way, there is no reason to disturb Judge Scott's credibility determination based on an incremental time discrepancy in the testimony.

## CONCLUSION

For the reasons stated above and in Judge Scott's Report and Recommendation, Docket Item 89, Pizarro's motions to suppress are denied.

IT IS SO ORDERED.

Dated: March 21, 2018
       Buffalo, New York

                                 *s/Lawrence J. Vilardo*
                                 LAWRENCE J. VILARDO
                                 UNITED STATES DISTRICT JUDGE